We have Timothy v. Boston Scientific, and we're ready whenever you are, Ms. Kosicki. Good morning, Your Honors. May it please the Court? My name is Jessica Kosicki, and I represent the appellants Sharrene and Tom Timothy in this matter. I think Ms. Kosicki, the microphone needs to be a little closer to you. Is that better? Much better. Thank you. In my time before the Court today, I will explain why the District Court erred for two reasons. First, the District Court's interpretation of Utah law was far too narrow, and secondly, the District Court applied the wrong standard when deciding a summary judgment based on an affirmative defense of statute of limitations. And so Sharrene Timothy was implanted with two Boston Scientific mesh products in June of 2009. She subsequently suffered an erosion of that product and had it revised in June of 2010. She saw a television commercial sometime in 2011, which alerted her to the fact that the mesh products used in her surgery could be defective, and she filed her lawsuit in September of 2012. The statute of limitations here is an inquiry notice statute, is that right? That's correct, Your Honor. What does that mean in this context? Is the patient required to know that their doctor has installed a defective product because he says, I'm going to repair it? Could the patient also consider that maybe the doctor made a mistake in installing it? How would the patient know? Sure, Your Honor. So the statute of limitations in this case is under the Utah Products Liability Act. It's a two-year statute of limitations with a discovery rule. Inquiry notice, if you look at what the plaintiff has to know, you have to look at what the court has determined the word cause is. And if we look to the Utah court, it's Aragon v. Clover Club Foods, which goes into whether or not what is included in the cause. Do you need to distinguish this case from our case in Robinson? Well, Robinson was different, Your Honor, and the reason that Robinson is different is because in Robinson she had a repair, I believe it was in 2007, maybe 2008, and then she continued to have problems after that repair and did so for many years, and she never inquired what the cause of that problem was. So in Robinson, her doctor said it was estrogen levels and intercourse that had caused it, and she never inquired further into that. In this case, we have a different set of facts here. And so Ms. Timothy was implanted in 2009, as I said. In April of 2010, she noticed some bleeding, and she called her doctor right away. In fact, her deposition testimony indicates that she called her doctor the very day that she noticed it. And her doctor told her that it looks like you have an erosion here. She actually had issues before that, right, in late December 2009. It's the first time she started experiencing pain. Your Honor, yes, I believe that is correct. She also went in in July of 2009 for painful urination, and it was determined that there was a stitch that had not resolved. And I believe that when she went in later in 2009, she was concerned that perhaps it was the stitches as well that had not resolved. And when she went in to discuss the problems that she was having with her doctor, as her deposition testimony reveals, her doctor sat her down and showed her diagrams and explained the aging process and said, look, this could be because of your hormones. It's just something that comes with aging. Well, in her deposition, she was asked at JA 140, and this is the April exam you're talking about, so did Dr. Johnson tell you he believed that the mesh was what was causing you to bleed? Answer, yes. There was an objection, and then she objected in a forum, and then she repeated the answer, that's a yes. Yes, Your Honor, but at that point she had no reason to know that there was anything wrong with the product itself. In her deposition testimony, she also indicated that she thought that perhaps her body hadn't healed properly. Inquiry notice, under your argument, is you have to know that the product itself was defective. So who was supposed to tell her that, the doctor or it's a lawyer's commercial however many years later? Well, Your Honor, I think it's a very fact-intensive issue on whether or not when inquiry notice started. And so in this case, admittedly, the doctor warned her before the implant was placed that an erosion could happen. So there was no reason for her to think that there was anything wrong with the product at that point. Was there any FDA warning for this Boston Scientific product? Was there an FDA warning? I believe there were two FDA warnings. One was in 2008, but the one that was specific to pelvic organ prolapse was not until 2011. I believe it was July of 2011. So the 2008 wouldn't have been... Why didn't that trigger inquiry notice? Well, at that point, she hadn't even had her implant yet. So the 2008 notification, if I believe, Your Honor, was simply that, look, there may be problems with this product, and it wasn't until 2011 that the FDA stated it's the pelvic organ prolapse products that are having problems, and these complications are not rare. And so she had no idea, really, that the product was the problem until she saw the commercial. And when you look at her... It says the mesh... Did the doctor tell you that the mesh was what was causing you to bleed? Answer, yes. Bleeding is the problem. Mesh is causing the problem. Her doctor told her that in April of 2009. It just seems to me that your argument puts the running of the statute of limitations squarely in the hands of the attorneys bringing the case. Not necessarily, Your Honor. I think there are instances in which a doctor could tell a patient that there's a problem with a product or that something was wrong with the product. And if you look at the inquiry notice, the Utah Laws inquiry notice, there are a number of cases that seem to suggest that the plaintiff or the patient has to know that there's some sort of defect there. The doctor in 2009 didn't say, I'm taking this thing out because it's defective. He said, she thinks it has caused the problem, but he can fix it. It's not a defective product. He doesn't say that he'll remove part of it and then the repair will work and you'll be fine. Yes, Your Honor. Isn't that basically your argument, that he didn't say anything about the problem is the mesh itself? Correct, Your Honor. And he also testified that he didn't know why it happened. He likened it to an accident. He said he came upon the accident after the accident. Can I ask you a question about inquiry notice? And I don't remember. There needs to be two things for someone to be on inquiry notice, right? There needs to be a reason why they should start asking around about whether this product is defective. And there also needs to be some likelihood that they will get a relevant answer when they start asking. Once you are on inquiry notice, you are responsible for what you should have learned when you started asking questions. And so let's assume that she is on inquiry notice. I've got the timeline here. Let's say when she has continued pain, like the doctor says, I'm going to fix this. It's fine. I'm very pleased with the repair. It doesn't work. She has continued pain. And that seems like it had to be sometime between June 2010 and November 2010. Had she started asking around then? Wait a minute. I think this mesh might be defective. Is there evidence in the record about what she would have found out, what sources of information would have been available to her had she started asking around? Well, if you look at her doctor's visits and if you look at the post-op visits after the June 2010 surgery, she continues to go in for checks, and she's very pleased. Her bladder is working fine. Her doctor is very pleased. In November of 2010, she goes in for pain, and she inquires. I think Judge Harris's question was, if she had started asking around in April of 2009, perhaps an Internet search or a consult with a lawyer, what would she have found? Is there any evidence in the record? I'm not. As to what she would have found. I don't believe there's anything in the record of what would have been there in 2009. I know she did discuss with her. Isn't that crucial? I mean, for the defense. This is an affirmative defense. Doesn't there need to be something in the record that will tell us this is what she would have found? Because that's what she's responsible for under inquiry notice, what a reasonable inquiry would have turned up. And, Your Honor, if you look at the records, I think that she did do a reasonable inquiry. She did go to the doctor when she had pain. She did go to the doctor when she had bleeding. And in November of 2010, she went again to the doctor for pelvic pain, and she was diagnosed with vaginitis and suggested that she get a colonoscopy. And so it wasn't until 2011 when she saw the commercial, and she made an appointment with her doctor. And she went to her doctor, and she said, Look, I'm worried. I've seen this commercial, and now there might be something wrong with my mesh. And even then, the doctor didn't examine it and said, I don't see any problems with your mesh. It seems like inquiring from her doctor was not going to turn anything up. Is there somewhere else? I will ask her colleague this, too, because it's not your obligation to put on the defense, but I was wondering about the state of the record on this question. I had the impression that the Utah law did not require her to know exactly the cause, but the preoperative note suggested the type of mesh, the manufacturers of the mesh was in the preoperative note back in June of 2009. So she just asked her doctor what mesh you installed, and she would know the identity. Doesn't Aragon talk about the identity of the product? Yes, Your Honor. Aragon did discuss the identity of the product, but what Aragon did not discuss was whether or not you had to know that there was some sort of problem with the product or negligence on the part of the manufacturer, and that's simply because that issue was not in front of the court at that time. Aragon involved a plaintiff that was injured by a dough-making machine. The plaintiff brought the suit against his employer and was trying to find the identity of the manufacturer of the dough-making machine. So the issue of whether or not you should know the negligent conduct of the defendant or the manufacturer was not necessarily on point in Aragon, but if you look to the cases that Aragon relied upon, you'll see the Washington cases, North Coast Air Services v. Grumman, Lahon v. LBJ International in Arizona case, and it also looked to West Virginia Hickman v. Grover. And then if you look at cases that looked to Aragon after it was decided, for example, in Strickland v. General Motors, which is a district court case out of Utah, that court cited to Aragon, and it stated that you had to know the cause in fact, the design defect in the product in order to bring a claim, and that was a district court in Utah in 1994. There's been another MDL court, Enray Bridgestone Firestone, which was a court out of the Southern District of Indiana, I believe, and it also analyzed Aragon. And while it noted that whether or not cause in fact was a required element, of the Utah Products Liability Act's discovery rule, it looked to these Washington cases, because those are the cases and the product liability statute that Aragon most heavily relied. And in Washington, it's required that you have to know that there's some, you have to feel there's something wrong with the product, there's some negligence on the part of the manufacturer in order to effectively bring a suit. And the Washington court stated that to do otherwise would risk bringing a frivolous lawsuit when you didn't know that there was actually... Well, that's a concern. One of the concerns is when a patient goes to see her doctor, and her doctor says, well, we're going to repair it, we're going to fix it, they'll not necessarily give her a notice to know that the product itself is defective. And we don't know if the doctor installed it correctly. There was some problem with the surgery to do it. Correct. There's a number of reasons why she could have had an erosion. It could have been installed improperly. It could have been that she had an estrogen deficiency. It could have been a product problem. But she didn't have that. Her doctor didn't indicate to her that there was anything wrong with the product. Your Honor, I see my red light is on. So unless you have further questions, I'll reserve the rest for now. Thank you. Thank you. All right, Mr. Rogers. Good morning. May it please the Court, Daniel Rogers on behalf of Boston Scientific. Your Honors, we believe that no matter how you interpret Utah law, in this case the facts support the summary judgment entered by the trial court. Obviously, we believe, and as we've advocated in our papers, there's a two-part test under Utah law, under the statute, which the courts in Utah have interpreted as having three factors. First, you have notice of your injury. I believe in this case it's undisputed. There was notice of injury in 2009. After the implantation in June of 2009, three weeks later, she was complaining about a scratchy feeling from the mesh inside. That's evidence of injury. We also had a poking feeling, and we had bleeding in 2009. So that was all evidence of injury. So then the second part of the Utah test, identity of the manufacturer. It's undisputed that the identity of the manufacturer was readily available in all of the medical records and discussed with the plaintiff what these types of products are, and I don't think there's really any dispute. The third was there notice, or should there have been notice upon inquiry notice and due diligence, that there was a possible causal relation between the product and the injury. That's all that's required under Utah law, and then you have two years to go ahead and investigate to determine whether or not. So the physician is the patient's advisor, the person who installed the mesh, who has the knowledge about the mesh, and he says, I'm going to fix it, I'm going to repair it. How does she know then that it was a defective product? Your Honor, our first point is that she doesn't need to know it's a defective product. She just needs to know that there's a possible causal relation to the product to trigger the statute of limitations. But even if you assume under Utah law that there is that requirement of a defect, in this particular case, there's no evidence. And in fact, when her doctor told her that the product was causing, the mesh was causing these problems, and that he can go in there and fix it, I mean, the product was causing injuries. Why is that not inquiry notice that there's a defect? And if he goes in there and he does some manipulation to the product, why does that then show and that alleviate? Let's assume that it alleviated all of the symptoms, which I'll get to in a second. What plan of scouts is going to take such a case at that point where the doctor says I can fix it and repair it? What plan of scouts is going to go out and say, well, this product must be defective, I'm going to bring a lawsuit? How can they even do that at the inquiry notice? Your Honor, in fact, it happens all the time. You have a situation where you have a doctor who is afraid of being sued for medical malpractice saying there's nothing wrong, I chose this product, I recommended it, I prescribed it for you, and no, there's nothing wrong, I'll go in there and fix it. Well, if that were the standard, then the statute of limitations would never incur in these cases. That's what Aragon says, right? And there had also been an FDA warning in 2008, certainly not as specific as the one in 2011. So coupled with that. Yes, Your Honor, absolutely. There was information available in the public record, and counsel indicated that, well, you have to only focus on the 2011 FDA notification because that is the one that related to pelvic organ prolapse products, but counsel forgets this is a case involving two different mesh implants, not just a pelvic organ prolapse mesh device, but also a stress urinary incontinence repair mesh. And so, therefore, all of these FDA notifications, which were publicly available, and trust me, there were attorneys out there who were monitoring this and ready to file cases. But another thing that's important to note in the record is that when the doctor said, I can fix this problem, and he went in there and he did his repair, it fixed only one of the many complaints that the plaintiff had. She had complained about a scratchy feeling. She had complained about a poking feeling. She had complained about painful urination. And finally, she had complained about the bleeding that occurred. Can you answer Judge Harris's question about, had she exercised due diligence at any point prior to 2011, is there anything in the record that would have indicated what she would have found regarding this product? Well, Your Honor, first of all, you have the testimony in the record, which indicates that she was expressly told that the mesh was causing her problems. Then we have the public record. Let's assume we're talking about, I know it's hard because we're bouncing you between two different arguments, but what is in the record about what due diligence would have revealed about the likelihood of a product defect? Your Honor, what she needs to have notice of is that there was a problem with the product that was causing her problems. She's not an expert in product defectiveness, as courts interpret it, in like a risk-benefit analysis or a consumer expectation. It's really tough to impose that kind of standard in this context. So what you need to do is you need to focus on what information did she have that would let her know that there was something with this product that was causing her problems. I think that that's the appropriate standard to apply, not that she knew, quote-unquote, it was defective. And what I was trying to explain to Judge Fanker earlier is that she had four different complaints. The doctor said, okay, I'm going to go in there and fix it. The testimony in the record is undisputed that that fix only cured one of the four complaints and that the mesh was still causing three other complaints for which she is seeking relief in this lawsuit. So if you're talking about does she on inquiry notice that the mesh is a possible causal relation to her injuries, I believe you have the testimony from the plaintiff herself, you've got the medical records indicating that, as well as the public health notification that was out there from 2008 saying that there are these potential complications as a result of these particular products. Does that answer your question? Yeah, I'm sorry, I'm still looking perplexed because that seems to me the right answer if we're assuming that the Utah court would not adopt kind of the Washington approach to this where you actually have to be on notice of a product defect. And I understand what you're saying about it's kind of weird to ask what a reasonable person would understand the cost-benefit analysis that makes a product defect defective. But I think there has to be a distinction between you know that the mesh is causing you problems and you have reason to know that those problems are because of something inherent to the mesh. It's not that it was installed wrong, it's not that your estrogen is low, it's not that you're having too much sex, it's something about the mesh. And when we look at the record in this case, the undisputed facts in this case, there is zero evidence of any other potential cause for any of the complaints that she was having. Her doctor never told her or nobody ever told her that well maybe it was surgeon error that caused this thing or maybe it's because of your body kind of rejecting the device. There was no evidence of that. What there was evidence of is that she had the product and that she started experiencing these complications which were known complications and publicly known complications in the directions for use in the product. They even warn of different types of complications including bleeding. And so when you have that type of knowledge, that triggers I believe an inquiry notice and starts the statute of limitations where you have two years to investigate whether or not the product is defective. And in fact if you look to the Utah case law, the Utah case law that we have cited in our brief specifically talks about how once you know of the possible cause or relation that triggers the two-year statute which you have to investigate. And then the case law is actually from Utah that we cite says that then you have, once you file your lawsuit, then you undertake the discovery of whether or not the product is defective or whether it's a result of the negligence. Because you can't, I think the cases talk about it's impossible. This is the second time in the last several months that we've been up here talking about Utah law in the context of these cases. Should we certify the question to Utah? Your Honor, of course I've thought about that. I mean in our position is we believe that there is no Utah case that has said that's required. And I believe we've cited the cases which we believe demonstrate that under Utah law all you need is a possible cause or relation. But I think if this court were inclined to say that Utah law is the same as Washington law, I think that that would be setting a very dangerous precedent that the Utah courts, no Utah court has ever said. And so therefore I would definitely urge before that type of holding a referral to the Utah courts to answer that question. But our first answer to that is we believe the Utah courts are clear that you don't need that. And I can walk your Honor through those cases that explain that. But secondly, and I tried to get to this earlier, is that even if we were to assume that that were the standard, as was the case in the Robin decision, which I know your Honors were involved in, even if we assume that, like you did in Robinson, that cause in fact or product defect was required, in this case there is evidence in the record that she had that notice because she had four complaints, her doctor said I'm going to fix it, and then after that surgery she still had the three complaints left. And so if we look to how the Robinson decision analyzed the issue. I still have this question and just comparing this case to Robinson. So let's assume, I'm not sure about this, but I'll assume fine that the day after the doctor removes part of the mesh and says he's very pleased with the repair, that day she should start asking around. What is in the record about what she would have found had she started asking around? We know her doctor would not have said this mesh is hopeless, it has to go. So maybe she could have done a Google search, but is there somewhere in the record where it shows me what you get if in 2010 you had Googled this problem? Your Honor, no, there wasn't. I mean, the arguments weren't made in that fashion below by the other side, and so there was no evidence that was submitted on it at the point. Is that a problem? No, I do not believe that's a problem at all, Your Honor, because I believe that the evidence in the record does point to the fact that she had notice of the possible causal relation, and that's enough to trigger the statute of limitations. And then she had two years to investigate. She had notice. This isn't an inquiry notice case at all. She literally had notice. It's not that she was supposed to ask around. She already knew that this was not effective. Absolutely, absolutely, number one, that she had notice of the possible causal relation to the product. But even if she didn't have subjective notice of that, under a due diligence standard and the inquiry notice standard, she did. And so what we have to do is we have to – I just feel like we're talking – No, no, no, I don't get there. I really do want to make sure I understand, because had she asked around, and I'll give you June 2010 – I don't have the appendix with me, so I can't do a big show, but you can see from here this is what she would have found out. I agree, Your Honor. There is nothing in the record that says that if she would have called in June of 2010, and she would have called plaintiff lawyer Tom Jones, Tom Jones would have taken her case, or there was a study out there that specifically said that. What we do know is there's public record, which in fact has been cited to by the plaintiff in her brief about the FDA notifications that were out there in 2008, letting you know that there are these potential problems with these products, which was publicly available in 2008 from the FDA. And then we also need to look at what was available in the two years from that time. So we need to look from that April to June 2010 to April, June 2012. And what do we know? Was what publicly available in then? The 2011 FDA notification that the plaintiffs are saying absolutely should have put everybody on notice. So she'd have two years from then, and she's within that. No, no, no. I don't agree with that. If you have inquiry notice, and you have the obligation to go out there for two years and make an investigation to determine whether or not you have a product, I believe, first of all, obviously our position is there was information available. But even if you were to look at the 2011 one, that was information that was available in that two-year period. And then she had more than a year, I think. I forget exactly when in 2011 that was. But she had a significant amount of time to go ahead and file her lawsuit. So under any analysis, we believe that this was the proper summary judgment. Let me also certify this inquiry notice question, because I read Utah law to say once you are on inquiry notice, maybe you are charged with knowing what you could learn. So you're suggesting that the day the 2011 FDA thing comes out, she needs to file suit that day? She doesn't need to file suit that day. She needs to file suit within two years when she had notice of a potential problem. The Utah courts have expressly said if you harbor any doubts or questions, that's when the inquiry notice period starts. And you have two years to determine. In your view, when was that? From April of 2010. Oh, 10. 2010, when her doctor told her that the mesh was causing her problems. I mean, she testified to it twice in her deposition. In addition to that, I don't think we even need to go that far, Your Honor. And I've tried to get to this. I haven't concluded my thought on this a couple of times. But she had four complaints that the mesh was causing. The doctor said he was going to fix it with a trim. Only one of those complaints was resolved. She had three different complaints that continued on after the surgery. She says they continued on until the time of her deposition. And so, therefore, she had notice that the mesh was causing her problems and that the doctor fixing it did not it. So under a Robinson analysis, that is exactly where this court affirmed and said that summary judgment was proper. So if you were to go under the interpretation of Utah law that we have suggested is appropriate based upon the Utah cases, all you need is knowledge of a possible causal relation. We believe that the doctor telling her that the mesh was the cause was enough to trigger the two-year statutory clock to start. But even if you were not to say that, and even if you were to go that you need knowledge that there was a defect in the product that was causing the problem or negligence on behalf of the defendant which was causing the problem, which we don't think is the standard under Utah. We understand it's the standard in Washington. It was not the standard in West Virginia with the other case that the Utah court cited. But even if you were to go under that analysis, we believe that the summary judgment in this case was proper. All right. And that's trying to figure out which of the cases, the Adams case which is a 2014 Utah district court case which actually involved a sling device similar to the sling device links that was installed in the plaintiff in this case. In that case, the doctor said that the injury that the plaintiff had sustained was from the sling migrating out of place. In this case, we've got a mesh device that was installed that created an erosion. It went outside of where it was supposed to be. In Adams, the Utah district court said that started the clock. And in that case, as in this case, the injury actually continued after the revision surgery. The plaintiff in that case still had problems. And the court said that even goes more to show that she was on notice of the harm and the possible cause. And so, therefore, the statute of limitations appropriately started at that time. So we have almost an on point with a similar type of device with similar types of facts about what the doctor was telling the patient, about how the injuries were being caused, and the statute of limitations started at that time. All right. Another case that we've cited is the McCullen. Let me ask you a quick question as your time is running out. Why isn't this a question for the jury? Because the facts on this case are undisputed. No reasonable jury to come to the conclusion that someone who's told in April of 2010 that the mesh is causing your problems under any circumstance, that is something that no reasonable juror could find. The clock did not start at that time under these undisputed facts. It's not like we have a situation here where someone's saying, you know, the light was red and somebody's saying the light was green and we have disputed issues of fact. There are no disputed issues of material fact in this record. And the deposition testimony and the medical records that are before the court lead to only one reasonable conclusion that a jury could reach. We have to remember, you know, Judge Goodwin, who was handling all of these MDLs, he faced a lot of these motions. And he only granted them in a couple of cases that have been before this court. He did not willy-nilly take things away from the jury. This is one of the clear-cut cases in which the statute of limitations bars the claim. The McCullen v. Synthes case, which is another District of Utah case that we've cited on our papers, is the one that I referenced earlier that talks about how once you have those doubts and the questions about whether or not there is a possible cause or relation, you have an obligation to file your lawsuit within two years. And then the court expressly says, then you can engage in discovery about negligence, about the potential product defect. You don't need to have that knowledge to trigger the two-year statute of limitations. And the McKinnon v. Tambrans case, which is another District of Utah case, is the one that says you don't need the confirmed definitive diagnosis. And you don't even need to know the full extent of your injury. All you need to know is that you have some injury and a possible cause or relation to the product. And we believe that undisputably exists in this case by April of 2010, as the District Court found. Even if you go to June 2010, under your theory, it would still be a bar, wouldn't it? Even if you go to June when the surgery took place, it would still be too late. Absolutely, Your Honor. And she testified that after that surgery, her problems continued on the other three besides the bleeding. So we believe that she was on notice at that time, that she had a potential claim. She had two years to investigate, find a lawyer, and file a lawsuit. She waited too long. She waited for, as the courts of Utah have talked about, they said that you can't wait for the case to come to you. You can't wait for a television commercial to come on and say, this is a problem. You have a duty to go out there and investigate. And in this case, that just simply, simply did not occur. And if Your Honors are inclined to wade into the defect issue and whether or not that's required, we don't believe you need to resolve that issue in this case. But we believe that there are a ton of policy considerations that weigh in favor of finding our interpretation. And I think we've set those out in the papers and in the cases, talking about how the statute of limitations would never start if that was the standard, that you needed to know a product defect. It would be the fortuity of having to wait until that occurs. And I believe the Robinson court had a nice footnote on that explaining why that just cannot be the standard. Thank you very much. Thank you. Thank you. Okay. A couple points on rebuttal, Your Honors. After Ms. Timothy's repair surgery in 2010, she testified that the dyspareunia got better, that her and her husband were actually able to engage in sexual relations, and they just had to watch the positions that they were on. So the repair surgery improved her dyspareunia. She went to the doctor before she had an erosion and inquired about dyspareunia, and that's when he sat her down and explained aging and estrogen levels and hormone levels. So that did improve after the repair surgery. As far as the painful urination and urinary tract infections, those are some things that she had suffered for before she even had mesh implanted. And the scratchy feeling that she testified about, the doctor prescribed a yeast cream for that. So it could be that that was a yeast infection that she was having that she can't shake or a vaginal infection of some sort. With regard to the inquiry notice in Utah law, if you look at the cases in Utah, and counsel cited a couple of them, first of all, the Adams case, if the plaintiff in Adams was told that the mesh had migrated out of place, that would probably be enough to put you on notice that the mesh did something wrong. But that wasn't the case here. Here the doctor said the mesh has eroded. He said eroded. And admittedly that's something that he warned her could happen with the mesh. So it's not like she would have thought, okay, well, I've got to go sue. What if she didn't see a commercial until 20 years from now? Well, Your Honor, she – For 20 years? No, Your Honor. I think that it's a very fact-intensive inquiry. And so if she was having problems and going to the doctor and trying to figure out the cause of her problems, at some point she would think, okay, well, maybe this is the mesh that's causing these problems. I've ruled out everything else. When is that point? Well, in this case, we know that point is in August 8 of 2011. When she saw the commercial. When she saw the commercial. But if she had continued problems with the mesh, if she was continuing to have pain, if the – I thought she said she does have continued problems with the mesh. Well, she – That's the whole point of her complaint, right? Yes, Your Honor. But the issue is, is that when should she have known that those were specifically related to the mesh? And it wasn't until after she had – that she saw the commercial. Because she went to the doctor. Right. So if the commercial was 15 years from now, what's the difference? Well, Your Honor, I think it really depends on each case. And in this case, we know that when she has problems, she goes to the doctor. She's very diligent about going to the doctor. And so if she was going to have continued problems, which I think in 2013 a doctor said, okay, it's the mesh that's causing your problems. But she went to the doctor and said, okay, look, now that I'm on notice, now that I think, oh, my gosh, there might be something wrong with this, I'm worried. Can you please tell me if there's anything wrong with the mesh? And the doctor said there wasn't. So were there disputed facts that you think should go to the jury? Yes, Your Honor. Namely, when she knew or should have known that she had a problem with her mesh. When in 2011 did the FDA notice come out? Do you know? I believe it was July 2011, Your Honor. And her first appointment with her doctor after she saw the television commercial was August 8, 2011. She went back in September of 2011. Wait, did she saw the commercial after the second FDA notice? It would have – she didn't remember exactly when in 2011 that she saw the commercial. She just knew it was in 2011. And if you look at the medical records, her appointment was August 8, 2011, when she went in to inquire about the mesh. So it was somewhere kind of in that time frame. But you said she's very diligent, so she must have seen the commercial sometime close to August. I would hazard a guess, Your Honor, that that's correct, that it would have been somewhere in that time frame. So the FDA warning came out before the commercial? Yeah, if she saw it in August, yes, Your Honor. She was diligent. And so – Can I ask you just a question about the timing and how inquiry notice works in Utah, which I continue to be somewhat perplexed by? So assuming hypothetically, let's say, that the continued symptoms, and I really am being totally hypothetical here, but assuming that the continued symptoms in 2010 after the repair, June 2010 is the repair, she has some continued symptoms. I totally take your point about her doctor says I can fix that with his infection medication. But she has some continued symptoms. Assuming then she's on inquiry notice, she's supposed to start asking around. I assume you can see that by July 2011, when the FDA notice comes out, at that point, if she's doing a diligent investigation, at that point she would know there is reason to believe there's a product defect involved. So is it your understanding that – so how long does she have after the FDA notice to file suit? Well, if the FDA notice was what would trigger the inquiry notice, then she would have two years from the time that she discovered or within the exercise of reasonable diligence should have discovered both the harm and its cause. And that's what the Utah Product Solubility Statute states. You're not finally on inquiry notice until you have both the reason to ask around and an answer. Correct, Your Honor. And we can see that she did go to the doctor in between that time of the repair and when she filed suit. She went in November of 2010 because she was experiencing some pain, and she was diagnosed with vaginitis. There was never a point at that time where the doctor said, oh, it's a mesh that's causing your pain. It wasn't until she saw that commercial and then she started doing Internet research. She started going to the doctor. She was seeking second opinion. She was looking to find what if there was a problem with her mesh because she was concerned. Just briefly, Your Honor, the counsel cited McCollins v. Sents, which is also a case that was cited by the district court. That case can be distinguished from this case. In that case, the plaintiff or the patient stated that he knew immediately. It was a back implant case. And the patient stated that he knew immediately after surgery that the product had made his pain worse. And the doctor also testified that he was going to replace that product with a better product, a stronger product, and many of his other patients were also experiencing the same issues. With regard to McKinnon v. Tambrands, that case was decided before Aragon v. Clover Club Foods. And in that case, the plaintiff in that case had a suspicion that the tampons were ‑‑ there was a problem with the tampons to the extent that they contacted the manufacturer, wrote the letter to a manufacturer saying, I believe you should compensate us for unreimbursed medical expenses. So at that point, there was some idea that the manufacturer was responsible in both of those cases, Your Honor. So unless the court has any additional questions. All right. Thank you so much. Thank you very much. We'll adjourn court until 930 tomorrow morning and come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Stephanie D. Thacker, Pamela A. Harris, Gerald Bruce Lee